14811

GABLE v. SOUTH CAROLINA TAX COMMISSION

(1 S. E. (2nd), 244)

*Messrs. John M. Daniel, Attorney General,* and *Claude K. Wingate,* for appellant,

*Mr. Braxton C. Wallace,* for respondent,

January 31, 1939.

The opinion of the Court was delivered by MR. CHIEF JUSTICE STABLER.

This action was brought on January 29, 1938, for the recovery of $3,360.42 and $374.39 normal income tax and intangible tax paid by the plaintiff, the first item having been paid under protest. A jury trial, by agreement of the parties, was waived, and the matter was heard by his Honor, Judge Gaston, who gave judgment for the plaintiff and ordered a refund of such taxes, with interest.

The facts, as agreed to, are as follows: The plaintiff, who is one of the nine shareholders of the company, is the owner of 43 1/3 shares, out of a total of 1,000 outstanding shares of the capital stock of Dibert, Stark and Brown, Ltd., a Louisiana corporation, which has an authorized and

paid-in capital of $100,000.00. There has been no change in the paid-in capital, or in the number of outstanding shares, since the organization of the company. In 1900, or thereabout, the corporation purchased a considerable acreage of land and growing timber in the State of Louisiana, the timber being bought with the idea of cutting and marketing the same in due course. On January 1, 1921, the company had a surplus of $1,670,130.34, which had accumulated from earnings prior to that date, and a further and an additional surplus of $1,350,642.07, which represented the increase in value of the stumpage owned, and as determined by the Federal Government in 1919 (but as of March 1, 1913), for Federal income tax purposes; the increase in the value of the stumpage being due to the fact that the government appraised the standing timber, which cost only $1.058 per thousand feet, at $8.00 per thousand feet. Subsequently to 1921, this timber surplus was converted into a cash surplus, and at December 31, 1933, the company had a surplus of $1,195,556.80 from converted stumpage and other profits accumulated prior to 1921, and a further surplus of approximately $100,000.00 accumulated from current earnings.

During each of the years 1934, 1935 and 1936, the company paid a cash dividend of $300,000.00 this being 300% of capital or $300.00 per share. The plaintiff in this action, in each of these years, received $13,000.00. For 1934 he reported $367.20, for 1935 he reported $2,254.39, and for 1936 he reported $1,965.51 as taxable income to both the Federal and the State Governments, but did not report, respectively, $12,632.80, $10,745.61 and $11,034.49, because the company had advised him that the Federal Government had determined that this portion of the income was nontaxable for Federal taxes. All of the timber was cut out in 1934, and since that date the company has been in process of disposing of the stock on hand, dismantling and disposing of the sawmill and equipment, and doing everything possible to convert their miscellaneous assets into cash.

The first South Carolina income tax law was enacted in 1922, and made retroactive to January 1, 1921, and the first Act taxing dividends for both normal and surtax was enacted in 1933 (Act May 31, 1933, 38 St. at Large, p. 567). The Act of 1934 (Act April 16, 1934, 38 Stat. at Large, 1571), in the nature of an amendment to the Act of 1933, "merely raised the nontaxable interest and dividends from $100.00 to $200.00, and made changes in the percentage rate at which the excess is taxable."

The sole question presented by the appeal, as counsel agree, is whether or not the respondent is liable, under the special facts of the case, for normal income tax and intangible tax on the dividends paid to him during the years 1934, 1935 and 1936, as above indicated.

The appellant argues that the amounts received by Gable as dividends were income and not returns of capital, as claimed by him. Gable insists, however, that these amounts were not income for the particular years in which they were received; that the actual income had come into being, in the increased value of his shares, long before the income tax statutes were ever enacted in South Carolina. In other words, he claims that he should not be taxed, because the corporation paying the dividends paid them out of a surplus which it had earned and accumulated prior to the enactment of the South Carolina income tax law and the so-called intangible tax law. There being no South Carolina case directly in point, Federal decisions are relied upon, the respondent citing *Lynch v. Turrish,* 247 U. S., 221, 38 S. Ct., 537, 62 L. Ed., 1087, 1090, and the appellant, *Lynch v. Hornby,* 247 U. S., 339, 38 S. Ct., 543, 545, 62 L. Ed., 1149, the opinions in these cases being filed on the same day.

Under the facts peculiar to the present case were the amounts received income or were they returns of capital? Dividends have been defined as a "fund set apart out of profits, to be apportioned among the shareholders." 18 C. J., 1406. In *Lynch v. Hornby, supra,* the Court had this to say thereabout: "Dividends are the ap-

propriate fruit of stock ownership, are commonly reckoned as income, and are expended as such by the stockholder without regard to whether they are declared from the most recent earnings, or from a surplus accumulated from the earnings of the past, or are based upon the increased value of the property of the corporation. The stockholder is, in the ordinary case, a different entity from the corporation, and Congress was at liberty to treat the dividends as coming to him *ab extra,* and as constituting a part of his income when they came to hand." See also *Hadden v. South Carolina Tax Commission,* 183 S. C., 38, 190 S. E., 249; *State ex rel. Moon Company v. Wisconsin Tax Commission,* 166 Wis., 287, 165 N. W., 470; *Stoffregen v. Moore,* D. C., 264 F., 232; *Skinner v. Union Pacific Coal Co.,* 8 Cir., 249 F., 152, 153. In the last named case, the Judge writing the opinion said: "We have not been cited to any decision holding that a dividend is income of the stockholder as fast as the profits out of which it is paid are accumulated by the corporation. On the other hand, the Courts have uniformly held that the stockholder acquires no interest whatever in such a dividend until it is paid." From these decided cases, and from others that might be cited, it seems clear that the surplus of a corporation does not belong to the stockholder, and that he has no title thereto, so long as it remains a surplus; and that he acquires title to it only when dividends are declared and paid to him.

Counsel for respondent, however, calls attention to the holding in the *Turrish case,* that while the stockholder has "no title for certain purposes to the earnings of the corporation, net or other, prior to a dividend being declared," earnings "might become capital by investment in permanent improvements and thereby increase the market value of the shares" (247 U. S., 221, 38 S. Ct., 539), and contends that we have here such a case—not the ordinary one. In other words, that this case is almost identical in its facts with the *Turrish case,* where it was held that the dividends paid were not taxable.

For the purpose of comparison, we quote here the facts of that case, as stated by the Court in its opinion:

"Prior to March 1, 1913, and continuously thereafter until the surrender of his stock as hereinafter mentioned plaintiff was a stockholder in the Payette Company, which was organized in the year 1903 with power to buy, hold, and sell timber lands, and in fact never engaged in any other business than this except minor businesses incidental to it. Immediately after its organization this company began to invest in timber lands, and prior to March 1, 1913, had thus invested approximately $1,375,000.00.

"On March 1, 1913, the value of its assets was not less than $3,000,000.00 of which sum the value of the timber lands was not less than $2,875,000.00. The increase was due to the gradual rise in the market value of the lands. At that date the value of Turrish's stock was twice its par value, or $159,950.00, and about that time he and all the other stockholders gave an option to sell their stock for twice its par value. The holders of the option formed another company, called the Bose-Payette Lumber Company, and transferred the options to it. The options having been extended to December 31, 1913, the new company informed the Payette Company and its stockholders shortly before this date that instead of exercising the option it preferred and proposed to purchase all of the assets of the Payette Company, paying to that company such a purchase price that there would be available for distribution to its stockholders twice the par value of their stock. The stockholders by resolution authorized this sale, and, pursuant to this and a resolution of the directors, the Payette Company transferred to the new company all of its assets, property, and franchises, and upon the completion of the transaction found itself with no assets or property, except cash to the amount of double the par value of its stock which had been paid to it by the new company, and with no debt, liabilities, or obligations except those which the new company had assumed. The cash was distributed to the stockholders on the surrender of their

certificates of·stock, and the company went out of business. In this way, upon the surrender of his shares, Turrish received $159,950.00, being double their par value." The Court held that this amount, under the special facts of the case, was not taxable.

In the case at bar, while it is agreed that "all of the timber was cut out in 1934, and since that date the company has been in process of disposing of the stock on hand, dismantling and disposing of the sawmill and equipment, and doing everything possible to convert their miscellaneous assets into cash," it appears that, although several years have passed since the company decided to close out its business, the attempted liquidation of its affairs is still in process, with no certainty as to when it will become final. The plaintiff has since been paid dividends by the corporation, as we have seen, for a number of years, and he still holds his stock therein, upon which further dividends will doubtless be paid for the reason that the company still owns, if no other property, a large acreage of land which is yet to be disposed of before there can be final liquidation of its assets and business and a surrender of its charter. This, we think, is a different situation from that disclosed by the facts in the *Turrish case*. "where the distribution in question," as pointed out by the Court in *Lynch v. Hornby, supra*, "was a single and final dividend received by Turrish from the Payette Company in liquidation of the entire assets and business of the company and a return to him of the value of his stock upon the surrender of his entire interest in the company, at a price that represented its intrinsic value at and before March 1, 1913, when the Income Tax Act took effect."

The facts of the *Hornby case*, as stated by the Court, were as follows: "Hornby, from 1906 to `1915, was the owner of 434 (out of 10,000) shares of the capital stock of the Colquet Lumber Company, an Iowa corporation, which for more than a quarter of a century had been engaged in purchasing timber lands, manufacturing the tim-

ber into lumber, and selling it. Its shares had a par value of $100.00 each, making the entire capital stock $1,000,000-.00. On and prior to March 1, 1913, by the increase of the value of its timber lands and through its business operations, the total property of the company had come to be worth $4,000,000.00, and Hornby's stock, the par value of which was $43,400.00, had become worth at least $150,-000.00. In the year 1914, the company was engaged in cutting its standing timber, manufacturing it into lumber, selling the lumber, and distributing the proceeds among its stockholders. In that year it thus distributed dividends aggregating $650,000.00, of which $240,000.00, or 24 per cent. of the par value of the capital stock, was derived from current earnings, and $410,000.00 from conversion into money of property that it owned or in which it had an interest on March 1, 1913. Hornby's share of the latter amount was $17,794.00, and, this not having been included in his income tax return, the Commissioner of Internal Revenue levied an additional tax of $171.00 on account of it, and this forms the subject of the present suit." The Court, holding that Hornby should pay the tax, said "that under the 1913 Act dividends declared and paid in the ordinary course by a corporation to its stockholders after March 1, 1913, whether from current earnings or from a surplus accumulated prior to that date, were taxable as income to the stockholder."

It seems clear, by a comparison of the facts, that the case before us while not identical with, is more nearly like the *Hornby case* than the *Turrish case*. It is true that the corporation here has been trying for several years to make disposition of all its property, etc., with a view to closing out the business, but there is no certainty as to when this will finally be done. During these several years, as we have seen, the respondent has been paid dividends on account of his shares of stock in the corporation, and doubtless as such owner, as appears from the record, will continue to receive them.

The Circuit Judge states in his decree, about which some argument is made, that the conclusion reached by him is based not only upon the facts of the case, but "upon the admitted statement in the record, that the Federal Government has determined that this portion of the income was not taxable for Federal taxes." It appears, however, that these dividends were not subject to Federal taxes for the reason that the Federal Income Tax Act of 1913 was amended by the Congress in September, 1916, specifically exempting from taxation dividends received by a stockholder paid from surplus earned or accumulated prior to the enactment of the Federal statute.

In *Lynch v. Hornby, supra,* it was said:

"We construe the provision of the act that 'the net income of a taxable person shall include gains, profits, and income derived from * * * interest, rent, dividends, * * * or gains or profits and income derived from any source whatever' as including (for the purposes of the additional tax) all dividends declared and paid in the ordinary course of business by a corporation to its stockholders after the taking effect of the act (March 1, 1913), whether from current earnings, or from the accumulated surplus made up of past earnings or increase in value of corporate assets, notwithstanding it accrued to the corporation in whole or in part prior to March 1, 1913. In short, the word 'dividends' was employed in the act as descriptive of one kind of gain to the individual stockholder; dividends being treated as the tangible and recurrent returns upon his stock, analogous to the interest and rent received upon other forms of invested capital.

"In the more recent Income Tax Acts, provisions have been inserted for the purpose of excluding from the effect of the tax any dividends declared out of earnings or profits that accrued prior to March 1, 1913. This originated with the act of September 8, 1916, and has been continued in the act of October 3, 1917. We are referred to the legislative

history of the act of 1916, which it is contended indicates that the new definition of the term 'dividends' was intended to be declaratory of the meaning of the term as used in the 1913 act. We cannot accept this suggestion, deeming it more reasonable to regard the change as a concession to the equity of stockholders granted in the 1916 act, in view of constitutional questions that had been raised in this case, in the companion case of *Lynch, Collector, v. Turrish (supra)*, and perhaps in other cases. These two cases were commenced in October, 1915; and decisions adverse to the tax were rendered in the District Court in January, 1916, and in the Circuit Court of Appeals September 4, 1916."

In the case of *Helvering, Commissioner, v. Canfield,* 291 U. S., 163, 54 S. Ct., 368, 369, 78 L. Ed., 706, decided in January, 1934, where this question was again considered, the Supreme Court of the United States had this to say: "The argument that the surplus of March 1, 1913, constituted capital is unavailing. We are not here concerned with capital in the sense of fixed or paid-in capital, which is not to be impaired, or with the restoration of such capital where there has been impairment. No case of impairment of capital is presented. We are dealing with a distribution of accumulated profits. Nor is it important that the accumulated profits as they stood on March 1, 1913, constituted capital of the company as distinguished from the gains or income which the company subsequently realized. When a corporation continued in business after March 1, 1913, the dividends it later declared and paid to its stockholders, whether out of current earnings or from profits accumulated prior to that date, constituted income to the stockholders, and not capital, and where taxable as income if the Congress saw fit to impose the tax. *Lynch v. Hornby,* 247 U. S., 339, 38 S. Ct., 543, 62 L. Ed., 1149 The provision of the act of Congress under consideration was a 'concession to the equity of stockholders' with respect to receipts as to which they had no constitutional immunity."

We have read and studied with interest the several decisions cited and relied upon by counsel, and have noted and carefully compared the facts stated with those of the case at bar. We are satisfied, under the facts agreed to in this case, that the respondent does not come within any exception to the general rule laid down and followed by the Courts which have passed upon this question. We think that the words "all dividends," as used in the State law, include dividends declared and paid by a corporation from earnings accumulated by it prior to the enactment of the statute now under consideration. We conclude, also, under the facts agreed to, and upon careful consideration of the decisions cited and quoted from, that the respondent is liable for normal income tax and intangible tax on the dividends paid to him, as above indicated, and that they were properly and correctly assessed and collected.

The judgment of the Circuit Court, therefore, is reversed.

MESSRS JUSTICES BONHAM, BAKER and FISHBURNE concur.

MR. JUSTICE CARTER did not participate on account of illness.